Fleming J.
When lord Fairfax established an office, for the purpose of parcelling out the lands in that extensive territory, some rules were necessary; and, as he differed from other individuals in the extent and nature of his property, those rules would of course be general I think he had a right to establish such *145 rules as he pleased, if they were reasonable. The one in question was established so long ago as the year 1734, long antecedent to Crapes warrant. It was, I think, considering lord Fairfaxes situation, a reasonable regulation; and it is to be presumed that it was known to all persons who took up land within that district of country. The revenue of the Proprietor depended upon his quit-rents, which not being demandable before a grant was made, it was proper that the party should, within a limited time, place himself in such a situation, as to render the contract as obligatory upon himself as it was upon lord Fairfax, or that he should leave the property open for subsequent appropriations. Crap made his entry in 1741, and died in 1773, so that thirty-two years elapsed, during which time he took no step towards perfecting his title. If in his life-time he had obtained a grant, he would have forfeited his estate by the non-payment of quit-rents for three years, and it is unreasonable that by his own neglect he should better his situation, and subject the other party to the contract to an inconvenience resulting from that neglect. More especially in this case, when that other party had notified his intention to avail himself of the forfeiture, unless the indulgence then held out was accepted, and the terms of it complied with, within a reasonable time. I am therefore of opinion, that the right of Crap was lost by his neglect, and that lord Fairfax might legally grant the land to the appellants, or to any other person.
Carrington J. —I consider this case to be so extremely clear, that it cannot be made more so by argument. The appellee having forfeited any right which he ever had to the land in question, by the most unreasonable negligence, has no ground upon which to establish an equity, that can entitle him to the relief afforded him by the decree. I think the decree ought to-be reversed.
The PREsiDENT.~=“Theappellants have obtained titles to the land in question, prior in time to that of *146 Doxvdall, and consequently have the law in their favor. Has Doxvdall superior equity to them, which shall warrant this Court in depriving them of the ir legal estate? What is it he asks? That the posteri or title, which he acquired by his patent, should relate back to the warrant, which was the inception of that title, so as to destroy the intervening right of the appellants. There are such things as relations in law; but they are legal fictions, invented for the purposes of justice, and not to work an injury to innocent third persons, who in the mean time have fairly and legally acquired a title to the subject in controversy. But if the doctrine were applicab!e to this case, there can be no question, but that Doxvdall might have availed himself of it at Law, and could not require the interference of a Court of Equity.
This brings us to inquire into the conduct of the parties. Has Crap done all in his power to intitle himself to a grant, or has he so conducted himself as to have deprived himself of such a right? If he has done all that it was necessary for him to do; then, as to lord Fairfax, the Court would consider Doxvdall as standing in the same situation, as if a grant had actually been made to him. But so far from it, he has done nothing which, by the conditions under which he purchased, he ought to have performed, and therefore he has not even acquired an equitable right. It is objected, that the rules of the Proprietor’s office were not only arbitrary and uncertain, but were locked up in secrecj'. The answer given to this was complete: they were made as public as they could be, and were reasonable in themselves. I have always been of opinion that lord Fairfax was to be considered precisely in the same situation as any other citizen- — that he held his lands under the grant made to him as other citizens did. But his situation in the inode of parcelling out his lands was very different. He was the Proprietor of an extensive country, and therefore he could not make particular agreements with the different individual;; uho desired to purchase portions of his lands. On this account he established an *147 office. employed different officers to transact the business of itj and laid down certain general rules defining the terms upon which he would grant his lands5 and in forming those regulations, he appears to have assimilated them as nearly as possible to those established in the Crown Office with respect to lands lying in the other parts of Virginia. How can those rules be called secret, which were published in the entry books In the office, and which- were open to the inspection of all persons applying for land. It is not unreasonable to say, that Crap must have known of the rule. He knew that the land was not to be given | he made no special contract with lord Fairfax respecting it¡ and it therefore became necessary for him to know upon what terms he did purchase ; and in procuring this Information, he must have got notice of the rule in question. Besides, he proceeded some steps in conformity with the rule. He obtained a warrant, and procured it to be surveyed, though not in time. As to the reasonableness of the rule, it is nothing to this Court. Crap was at liberty to purchase under it, or to let it alone if he did not like the terms. The parties were the proper, and the only judges of this. Crap having surveyed the land, went no farther. He paid neither fees nor composition, and consequently deprived lord Fairfax of such a portion of his revenue. How then can we consider him as standing in the same situation as if he had actually obtained a grant? It was objected, that lord Fairfax should have made an entry to complete the forfeiture, or should have done some act tantamount to an entry. This might have been necessary, if he had made a grant to the appellee, and the forfeiture had incurred afterwards, as for non-payment of quit-rents. It was not necessary where the legal estate had never been out of him. But If it were, I think he did an act tantamount to an entry, by granting warrants to the twoPicketsto survey the land for themselves» As to the custom of reciting in subsequent grants the prior forfeiture, l suppose It was similar to that which prevailed in the Crown *148 Office, and there it was never done but in cases where there had been a prior grant.
Concerning the advertisements of lord Fairfax, I [¶0 not th!nk he was in any manner obliged to give the notice for which they were intended, it was Crap's duty to perform the conditions which the rules of the office imposed, by paying; the composition, and apph ing for his grant. This he was at least bound to do w ithin a reasonable time, and before the land was re-granted. The advertisements held out an indulgence, which not having been accepted, nor the terms of it complied with, diminishes still more the claim of Dowdall to the relief of a Court of Equity. It is true, that the appellants did not strictly comply with the rules of the office, and of course they were liable to the legal effect of such conduct, if a warrant had been granted to another. But this was not done; lord Fairfax, exercising a power which belonged to him, waved the forfeiture, and as a proof that he had done so, executed grants to them.
I think the abandonment by Crap is fully proved. It is true that legal rights once vested, must be legally divested ; but equitable rights may be lost by dereliction.
It is unnecessary to inquire if the Pickets had no tice of Crap's title; since if they had, it could not have affected them, unless Dowdall had been prevented by fraud from obtaining a legal title.
Upon the whole, I am of opinion, that the appellants have superior equity on their side, especially against Dowdall, who seems to have come into the dispute as a volunteer, under an idea, that the Act of 1786 had given him a chance. But it is too clear, that that Act cannot apply to cases where grants had been made bv the Proprietor.
THE OPINION of the COURT is, “that the appellee^ grant in the year 1788, ought not to have relation to the time of the w arrant, by authority of which the land wras surveyed, dated in 1741, so as to be prior in effect to the intervening title of the appellants; *149 because relation being a legal fietions adopted for the furtherance of justice, is not to be admitted in any , case to produce wrong and injury to others, nor particularly in this case, where that relation comprehends a period of forty-seven years, and tends to establish a dormant claim in equity, never perfected by James Crap the elder, by paying the office fees and eomposition, so as to entitle himself-to a grant of the land, but on the contrary forfeited and abandoned by him, and by his heir after his death, as being not worth the pursuit, in consequence of which the Proprietor might lawfully grant the lands to another, and accordingly did grant them to the appellants, whose conduct in obtaining their said grants and legal preference appears to have been fair and irreproachable, so as to entitle them to more equity than the appellee, who became a volunteer for reviving this dormant and abandoned claim, some years after the date of the grants to the appellants, and that the said decree iserroneousN
Decree reversed with costs, and the bill dismissed with the costs of the Court of Chancery.([1])

(1) Nelson v. Suddarth, 1 Hen. & Munf. 350. Noland v. Cromwell. & Munf. 155. 172.